# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| APPLE INC., | |
|     Plaintiff, | Civil Action No. 2:21-cv-460 |
| vs. | |
| TELEFONAKTIEBOLAGET LM ERICSSON AND ERICSSON INC., | |
|     Defendants. | |

## ERICSSON'S OPENING CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................ 4

II.  DISPUTED TERMS IN THE '768 PATENT .................................................................. 4

    A.   "the length of the bit field . . ." ('768 Patent (Claims 1 and 8)) ......................................... 4

    B.   "N is the number of resources . . ." ('768 Patent (Claims 4, 10, 15)) .............................. 7

III. DISPUTED TERMS IN THE '724 PATENT .................................................................. 8

    A.   "wherein non-zero entries in the base matrix . . ." ('724 Patent (Claim 7)) ..................... 8

IV.  DISPUTED TERMS IN THE '312 PATENT ................................................................. 12

    A.   "generating a first security key . . ." ('312 Patent (Claim 15)) ....................................... 12

    B.   "using the latest security key . . ." ('312 Patent (Claim 15)) ......................................... 17

V.   CONCLUSION .............................................................................................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*
   35F.4th 1367,1373 (Fed. Cir. 2022) ...........................................................................................8

*Blackboard, Inc. v. Desire2Lean, Inc.*
   No. 9:06-cv-00155, 2007 WL 2255227 (E.D. Tex. Aug. 3, 2007)............................................9

*Novo Indus., L.P. v. Micro Molds Corp.,*
   350 F.3d 1348, 1357 (Fed. Cir. 2003).......................................................................................9

*Phillips v. AWH Corp.*,
   415 F.3d 1303, 1314 (Fed. Cir. 2005).....................................................................................15

## I. INTRODUCTION

Defendants Telefonaktiebolaget LM Ericsson and Ericsson Inc. ("Ericsson") submit this opening claim construction brief relating to the disputed terms in this case against Apple Inc. ("Apple"). The patents at issue are U.S. Patent Nos. 10,374,768 (the "'768 Patent"), 10,644,724 (the "'724 Patent), and 11,039,312 (the "'312 Patent"). As set forth in the Joint Claim Construction and Prehearing Statement (Dkt. No. 96), Apple does not propose any affirmative claim constructions and instead takes the position that eight terms across three patents are "indefinite." Apple's arguments are not compelling. Apple manufactures ambiguity where none exists and, in some instances, appears inclined to rely on fabricated embodiments from its expert to support its positions.

Apple's requests to invalidate claims for indefiniteness should be rejected and the terms should be given their plain and ordinary meaning.

## II. DISPUTED TERMS IN THE '768 PATENT

**A.** **"the length of the bit field depending on a maximum number of MIMO layers that the wireless device is capable of transmitting and a number of reference signal resources in a corresponding one of the reference signal resource groups" ('768 Patent (Claims 1 and 8))**

| Ericsson's Proposed Construction | Apple's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | Indefinite |

This phrase carries its plain and ordinary meaning. Independent claims 1 and 8 each recite a "wireless device with a plurality of reference signal resource groups." *See, e.g.*, Ex. A ('768 Patent) at cls. 1, 8. Thus, claims 1 and 8 require *at least* a first reference signal resource group and a second reference signal resource group. Ex. C (Haas Decl.) at ¶¶24, 32. An example of these two reference signal resource groups is shown in Dr. Haas' annotated Fig. 5 (reproduced below) where

the first reference signal resource group is shown in purple and the second reference signal resource group is shown in green.



Ex. C (Haas Decl.) at ¶16 (annotating Fig. 5 of the '768 patent to show an example of "a plurality of reference signal resource groups").

Although not required by claims 1 and 8, the wireless device can include multiple antenna panels (blue and red) and each of the plurality of reference signal resource groups (purple and green) can *correspond to a different one* of the antenna panels, *i.e.*, the purple reference signal resource group corresponds to the blue panel and the green reference signal resource group corresponds to the red panel. Ex. A ('768 Patent) at cls. 6, 12; Ex. C (Haas Decl.) at ¶16.

Each of the claimed reference signal resource groups, e.g., the purple and green groups shown above, also includes "a plurality of reference signal resources." Ex. A ('768 Patent) at cls. 1, 8; Ex. C (Haas Decl.) at ¶16. These "plurality of reference signal resources" are shown in Dr. Haas' annotated Fig. 5 (reproduced below) where the first reference signal resource group (purple) includes a plurality of reference signal resources (A1-A4 (pink)) and the second reference signal resource group (green) includes a plurality of reference signal resources (B1-B4 (yellow)).



Ex. C (Haas Decl.) at ¶16 (annotating Fig. 5 of the '768 patent to show an example of "a plurality of reference signal resource groups," (purple and green) "each group comprising a plurality of reference signal resources" (pink and yellow)).

In plain language, the first reference signal group (purple) must include two or more "reference signal resources" (pink) and the second reference signal group (green) must include two or more "reference signal resources" (yellow). The reference signal resources included in the first reference signal group therefore "correspond to" the first reference signal resource group. Ex. A ('768 Patent) at 8:43-53; Ex. C (Haas Decl.) at ¶25. Similarly, the reference signal resources included in the second reference signal resource group therefore "correspond to" the second reference signal group. Ex. A ('768 Patent) at 8:43-53; Ex. C (Haas Decl.) at ¶26.

In the Fig. 5 example, the number of reference signal resources (pink) corresponding to the first reference signal group (purple) is four, and the number of reference signal resources (yellow) corresponding to the second reference signal group (green) is also four. Ex. A ('768 Patent) at Fig. 5, 8:43-53; Ex. C (Haas Decl.) at ¶¶16, 19, 20, 30. This plain language understanding is supported by the specification. Starting with the summary of the invention, the '768 Patent explains that "the wireless device may include multiple antenna panels, where each of the plurality of reference

signal resource groups corresponds to a different one of the antenna panels." Ex. A ('768 Patent) at 4:56-59. In discussing Figure 5, for example, the '768 Patent explains that the "SRS resources 1-4 belong to the first SRS resource group," i.e., group A (purple) associated with Panel A (blue), "and SRS resource[s] 5-8 belong to a second SRS resource group," i.e., group B (green) associated with Panel B (red). *Id.* at 8:513-53.

For the above-mentioned reasons, a POSITA would have readily understood the words in the disputed phrase to carry their plain and ordinary meaning, and such a person would have recognized that "a number of reference signal resources in a corresponding one of the reference signal resource groups" is simply referring to the number of reference signal resource resources within one of the reference signal resource groups. Ex. C (Haas Decl.) at ¶28.

### B. "N is the number of resources in the first reference signal resource group" ('768 Patent (Claims 4, 10, 15))

| Ericsson's Proposed Construction | Apple's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | Indefinite |

This phrase carries its plain and ordinary meaning. The '768 Patent explains that "the wireless device may include multiple antenna panels, where each of the plurality of reference signal resource groups corresponds to a different one of the antenna panels." Ex. A ('768 Patent) at 4:56-59. When discussing Figure 5, for example, the '768 Patent explains that the "SRS resources 1-4 belong to the first SRS resource group," i.e., group A (purple) associated with Panel A (blue). *Id.* at 8:51-53; *see also* Fig. 5. Thus, a POSITA would have readily understood the words in the disputed phrase to carry their plain and ordinary meaning, and such a person would have recognized that "the first reference signal resource group" is a reference to one of the reference signal resource groups in the earlier-claimed "plurality of reference signal resource groups." Ex.

7

C (Haas Decl.) at ¶¶32-37. Thus, Apple's indefiniteness challenge should be rejected, and the claims should be given their plain and ordinary meaning.

### III. DISPUTED TERMS IN THE '724 PATENT

**A.** "wherein non-zero entries in the base matrix are described by triples (e, r, c) denoting that the non-zero entry with number e is in row r and column c of the base matrix, the triples being given by: (1, 1, 1) (2, 1, 2) (3, 1, 3) (4, 1, 4) (5, 1, 7) (6, 1, 10) (7, 1, 11) (8, 1, 12) (9, 2, 1) (10, 2, 4) (1, 2, 5) (12, 2, 6) (13, 2, 7) (14, 2, 8) (15, 2, 9) (16, 2, 10) (17, 2, 12) (18, 2, 13) … (194, 42, 2) (195, 42, 6) (196, 42, 12) (197, 42, 52)," ('724 Patent (Claim 7))

| Ericsson's Proposed Construction | Apple's Proposed Construction |
|---|---|
| Plain and ordinary meaning, which is "wherein non-zero entries in the base matrix are described by triples (e, r, c) denoting that the non-zero entry with number e is in row r and column c of the base matrix, the triples being given by: (1, 1, 1) (2, 1, 2) (3, 1, 3) (4, 1, 4) (5, 1, 7) (6, 1, 10) (7, 1, 11) (8, 1, 12) (9, 2, 1) (10, 2, 4) (11, 2, 5) . . . (196, 42, 12) (197, 42, 52)" | Indefinite |

The Court should reject Apple's indefiniteness allegation and adopt Ericsson's proposed construction, which corrects the USPTO's typographical error by correcting the 11th tuple to read (11, 2, 5). When a typographical error is made, a district court may correct typographical errors "only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims" and the determination "must be made from the point of view of one skilled in the art." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022) (internal citations and quotations omitted).

As Dr. Haas explains, a POSITA reading the specification and prosecution history "would have recognized that the only reasonable reading of the phrase requires the 11th triple '(1, 2, 5)' to read as '(11, 2, 5).'" Ex. C (Haas Decl.) at ¶¶39-44. Thus, a person of ordinary skill in the art would have understood from the claim language and the disclosure in the specification that the

8

patentee intended to claim (11, 2, 5) not (1, 2, 5). *Id.* at 40-44. For instance, the non-zero edges ("e") of each tuple increase in increments of 1 from 1 to 197 as shown in the emphasized claim language: "(*1*, 1, 1) (*2*, 1, 2) (*3*, 1, 3) (*4*, 1, 4) (*5*, 1, 7) (*6*, 1, 10) (*7*, 1, 11) (*8*, 1, 12) (*9*, 2, 1) (*10*, 2, 4) (*11*, 2, 5) (*12*, 2, 6) (*13*, 2, 7) (*14*, 2, 8) (*15*, 2, 9) (*16*, 2, 10) (*17*, 2, 12) (*18*, 2, 13) (*19*, 3, 1) (*20*, 3, 2) … (*184*, 39, 12) (*185*, 39, 49) (*186*, 40, 1) (*187*, 40, 8) (*188*, 40, 13) (*189*, 40, 50) (*190*, 41, 3) (*191*, 41, 11) (*192*, 41, 14) (*193*, 41, 51) (*194*, 42, 2) (*195*, 42, 6) (*196*, 42, 12) (*197*, 42, 52)." Ex. B ('724 Patent) at cl. 7; *see also id.* at 4:45-5:25 (listing these tuples with the non-zero edges ("e") ascending by 1 from 1 to 197); *id.* at 2:62-63 (explaining that there are 197 edges); Ex. C (Haas Decl.) at ¶¶40, 42.

The 11th tuple is consistently written in the '724 patent's specification, claims, and prosecution history as "(11, 2, 5)" and a POSITA would have understood the 11th tuple to begin with "11" not "1." Ex. C (Haas Decl.) at ¶¶40-44); *see Blackboard, Inc. v. Desire2Learn, Inc.*, No. 9:06-cv-00155, 2007 WL 2255227, at *12-*13 (E.D. Tex. Aug. 3, 2007), *aff'd in part, rev'd in part on other grounds*, 574 F.3d 1371 (Fed. Cir. 2009) (ruling that recitation of "redefined characteristics" rather than "predefined characteristics" was an evident typographical error that met the conditions to be corrected via claim construction). Correcting the 11th tuple to refer to the 11th edge "is not subject to reasonable debate based on consideration of the claim language and the specification." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003). Indeed, Apple provides no evidence that a POSITA would not understand that 11 comes after 10 and before 12.

Further, "the prosecution history does not suggest a different interpretation of the claims." *Novo*, 350 F.3d at 1357. The patentee presented claim 7 with the 11th triple written as (11, 2, 5) and the USPTO did not properly transcribe the 11th triple when issuing the '724 patent. *Compare*

9

Ex. B ('724 Patent) at 33:35 (issued claim 7 lists the relevant triple as (1, 2, 5)) *with* Ex. E ('724 Patent prosecution history) at page 7 of Amendment dated March 28, 2019 (claim 83 claiming this triple as (11, 2, 5)) *and* page 7 of Amendment dated October 23, 2019 (claim 83 claiming this triple as (11, 2, 5)) *and* page 7 of Index of Claims dated February 10, 2020 (equating issued claim 7 to prosecuted claim 83).

> wherein non-zero entries in the base matrix are described by triples (e, r, c) denoting that the non-zero entry with number e is in row r and column c of the base matrix, the triples being given by:
>
> (1, 1, 1) (2, 1, 2) (3, 1, 3) (4, 1, 4) (5, 1, 7) (6, 1, 10) (7, 1, 11) (8, 1, 12) (9, 2, 1) (10, 2, 4) **(11, 2, 5)** (12, 2, 6) (13, 2, 7) (14, 2, 8) (15, 2, 9) (16, 2, 10) (17, 2, 12) (18, 2, 13) (19, 3, 1) (20, 3, 2) (21, 3, 4) (22, 3, 5) (23, 3, 9) (24, 3, 11) (25, 3, 13) (26, 3, 14) (27, 4, 2) (28, 4, 3) (29, 4, 5) (30, 4, 6) (31, 4, 7) (32, 4, 8) (33, 4, 9) (34, 4, 10) (35, 4, 11) (36, 4, 14) (37, 5, 1) (38, 5, 2) (39, 5, 12) (40, 5, 15) (41, 6, 1) (42, 6, 2) (43, 6, 6) (44, 6, 8) (45, 6, 12) (46, 6, 16) (47, 7, 1) (48, 7, 6) (49, 7, 8) (50, 7, 10) (51, 7, 12) (52, 7, 17) (53, 8, 2) (54, 8, 6) (55, 8, 8)

Amendment dated March 28, 2019 at page 7 (claim 83 claiming this triple as (11, 2, 5)).

> 83. (Currently Amended) A method for use in a wireless transmitter of a **fifth generation, 5G, new radio, NR** wireless communication network, the method comprising:
>
> encoding information bits **for transmission in a 5G NR wireless network** using a low-density parity check (LDPC) code and a parity check matrix (PCM), the PCM being partitioned into square sub-matrices of size Z × Z and being described by a base matrix and a shift vector, the shift vector using a shift size $Z = 7*2^j$, where j is one of 0, 1, 2, 3, 4 and 5; and
>
> transmitting the encoded information bits to a **5G NR** wireless receiver,
>
> wherein the base matrix has one entry for each Z x Z sub-matrix, the entry being 0 corresponding to the sub-matrix being a null matrix, and the entry being 1 corresponding to the sub-matrix being a cyclic-permutation matrix obtained from a Z x Z identity matrix by shifting columns to the right by k elements,
>
> wherein non-zero entries in the base matrix are described by triples (e, r, c) denoting that the non-zero entry with number e is in row r and column c of the base matrix, the triples being given by:
>
> (1, 1, 1) (2, 1, 2) (3, 1, 3) (4, 1, 4) (5, 1, 7) (6, 1, 10) (7, 1, 11) (8, 1, 12) (9, 2, 1) (10, 2, 4) **(11, 2, 5)** (12, 2, 6) (13, 2, 7) (14, 2, 8) (15, 2, 9) (16, 2, 10) (17, 2, 12) (18, 2, 13) (19, 3, 1) (20, 3, 2) (21, 3, 4) (22, 3, 5) (23, 3, 9) (24, 3, 11) (25, 3, 13) (26, 3, 14) (27, 4, 2) (28, 4, 3)

Amendment dated October 23, 2019 at page 7 (claim 83 claiming this triple as (11, 2, 5)).

10

|   | 76 | - | - |
|---|----|---|---|
| 1 | 77 | = | = |
| 2 | 78 | = | = |
| 3 | 79 | = | = |
| 4 | 80 | = | = |
| 5 | 81 | = | = |
| 6 | 82 | = | = |
| 7 | 83 | = | = |
| 8 | 84 | = | = |
| 9 | 85 | = | = |
| 10 | 86 | = | = |
| 11 | 87 | = | = |
| 12 | 88 | = | = |

Index of Claims dated February 10, 2020 at 2 (equating issued claim 7 to prosecuted claim 83).

As Dr. Haas explained after looking at the specification, claims, and prosecution history, a POSITA would have immediately recognized the transcription error. Ex. C (Haas Decl.) at ¶42. In his opinion, claim 7 relates to base graph 2 (BG2) for new radio (NR) and BG2 "has 197 edges, represented by ascending integers: 1, 2, 3, 4, . . . , 194, 195, 196, 197 ('724 patent at 4:45-5:35) and the 'non-zero edge number e is in row r and column c' (*id.* at 2:65-67)." Ex. C (Haas Decl.) at ¶42. Thus, a "POSITA would have understood that the arrangement of edges in the triples increments by 1 such that the value of 'e' goes from 10 to 11 and from 11 to 12, not from 10 to 1 and from 1 to 12." Ex. C (Haas Decl.) at ¶42. Dr. Haas goes on to explain that the prosecution history "confirms that the 11th triple is (11, 2, 5) not (1, 2, 5)." *Id*. Apple offers no expert opinion for how a POSITA would have understood this phrase in light of the claims, specification, and prosecution history. Instead, Apple offers only attorney boilerplate in its invalidity contentions to support its indefiniteness allegations. Ex. D (Excerpts of Apple's Invalidity Contentions) at 56-57.

For the above-mentioned reasons, Apple's indefiniteness challenge should be rejected, and claim 7 should be given its plain and ordinary meaning such that the 11th triple reads "(11, 2, 5)" as explained in the specification, claims (1 and 10), and prosecution history. Ex. C (Haas Decl.) at ¶¶40-44.

## IV. DISPUTED TERMS IN THE '312 PATENT

**A.** **"generating a first security key used for integrity protection of messages delivered from the home PLMN to the electronic device upon successful authentication based on the first authentication request" / "generating a second security key used for integrity protection of the messages delivered from the home PLMN to the electronic device upon successful authentication based on the second authentication request" ('312 Patent (Claim 15))**

| Ericsson's Proposed Construction | Apple's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | Indefinite |

These terms carry their plain and ordinary meaning.[1] While a skilled artisan would understand the scope of this term from the claim language alone, the specification, other claims, and prosecution history of the '312 Patent confirm that the disputed term is not indefinite.

The specification of the '312 Patent provides numerous examples of the sequence of events leading to and including the "generat[ion of] a first security key." Ex. C (Haas Decl.) at ¶52. For example, in describing the "[o]perations of the electronic device" in Figure 8, the specification states that the processing circuitry transmits "a first registration and authentication request to a first PLMN to register and authenticate the electronic device 400." Ex. F ('312 Patent) at 10:26-30. Next, the processing circuitry "may generate a first security key (i.e., a $K_{AUSF}$ key)," which may then be stored. *Id*. at 10:31-33. Subsequent operations 802 and 804 "may include generating a first time stamp indicating a time when the first security key is generated and associating the first time stamp with the first security key," or may include incrementing a counter, the value of which may be associated with the first security key. *Id*. at 10:34-40. The processing circuitry may transmit a second registration and authentication request to a second PLMN, and then generate a second security key. *Id*. at 10:41-55.

---

[1] While Ericsson specifically addresses the "generating a first security key" term, any arguments apply with equal force to the "generating a second security key" term.



Figure 8

Ex. F ('312 Patent) at FIG. 8.

The specification further confirms the sequence of events carried in the method of claim 15 when it describes that "[a] successful Primary Authentication between the UE and the AUSF in the Home PLMN may lead to the establishment of the $K_{AUSF}$ key," i.e., the security key is generated only upon successful authentication. Ex. F ('312 Patent) at 1:62-65; *see also id*. at 5:3-5 ("[T]hese Primary Authentications may lead to two different $K_{AUSF}$ keys . . . ."). A POSITA would have understood this term read in light of the specification to mean that the generation of

13

the security key occurred in connection with a successful authentication procedure. Ex. C (Haas Decl.) at ¶55.

A POSITA would have also readily understood that in this context, a "successful authentication" refers to a positive verification by a PLMN, such as depicted in Figure 3 of the '312 Patent. Ex. C (Haas Decl.) at ¶ 55. As an initial matter, the written description specifies that the authentication referenced here occurs between a PLMN and an electronic device. *See, e.g.*, Ex. F ('312 Patent) at Abstract; *see also id*. at 2:23-32 ("a first PLMN that is authenticating an electronic device . . . a second PLMN that is authenticating the electronic device."), FIG. 3. A POSITA would thus readily understand the scope of this claim.



Ex. F ('312 Patent) at FIG. 3.

If the clear teachings of the specification were not enough, the prosecution history and language of other claims would have further enabled a POSITA to understand the scope of the claimed invention. The three independent claims of the '312 Patent are all generally directed to communication between a home public land mobile network (HPLMN) and an electronic device (see Table 1 below). The claims involve the same steps of the same process depicted from the perspective of the AUSF of the HPLMN (claims 1, 10) and from the electronic device (claim 15). Thus, independent claims 1 and 10 provide valuable context for determining the scope of claim 15. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[O]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

Specifically, the other independent claims of the '312 Patent confirm the timing of the steps of the claimed method and/or apparatus. In the AUSF of the PLMN, "the first security key is obtained in response to successful authentication based on the first authentication request." Ex. F ('312 Patent) at cls. 1, 10. In the electronic device, the first security key is generated "upon successful authentication based on the first authentication request." Given the context of the other independent claims, a POSITA would have understood the phrase "upon successful authentication" to mean that the action taken—i.e., the generation of a first or second security key—occurred in connection with a successful authentication procedure. Ex. C (Haas Decl.) at ¶55. That this language (underlined in Table 1 below) was added in amendment to overcome a § 103 rejection and cited by the Examiner in her Reasons for Allowance lends further support for the definiteness of this term. *See* Ex. G ('312 File History Excerpts) at 11-16, 18 ("Prior art fails to disclose . . . '*wherein the second security key is obtained in response to successful authentication . . .*' as required in independent claims 1, 11 and 25 [now 1, 10, and 10].") (emphasis in original).

This term is not indefinite because the Examiner, who is presumed to be a person of ordinary skill in the art, was able to understand it.

Table 1 – Comparison of '312 Claim Terms

| Claim 1 | Claim 10 | Claim 15 |
|---|---|---|
| A method by an Authentication Server Function, AUSF, of a home public land mobile network, PLMN, configured to communicate through an interface with electronic devices, the method comprising:<br>. . . | An Authentication Server Function, AUSF, of a communications system that comprises a home public land mobile network, PLMN, configured to communicate through an interface with electronic devices, the AUSF comprising: at least one processor configured to perform operations comprising:<br>. . . | A method in an electronic device configured to communicate through a wireless air interface with a home public land mobile network, PLMN, and visiting PLMNs, the method comprising:<br>. . . |
| obtaining a first security key used for integrity protection of messages delivered from the home PLMN to the electronic device, <u>wherein the first security key is obtained in response to successful authentication based on the first authentication request</u>;<br>. . . | obtaining a first security key used for integrity protection of messages delivered from a home public land mobile network, PLMN, to the electronic device, <u>wherein the first security key is obtained in response to successful authentication based on the first authentication request</u>;<br>. . . | generating a first security key used for integrity protection of messages delivered from the home PLMN to the electronic device <u>upon successful authentication based on the first authentication request</u>;<br>. . . |
| obtaining a second security key used for integrity protection of the messages delivered from the home PLMN to the electronic device, <u>wherein the second security key is obtained in response to successful authentication based on the second authentication request</u>;<br>. . . | obtaining a second security key used for integrity protection of the messages delivered from the home PLMN to the electronic device, <u>wherein the second security key is obtained in response to successful authentication based on the second authentication request</u>;<br>. . . | generating a second security key used for integrity protection of the messages delivered from the home PLMN to the electronic device <u>upon successful authentication based on the second authentication request</u>;<br>. . . |

For at least these reasons, the Court should reject Apple's indefiniteness challenge and these terms should be given their plain and ordinary meaning.

### B. "using the latest security key to determine contents of a message received from the home PLMN" ('312 Patent (Claim 15))

| Ericsson's Proposed Construction | Apple's Proposed Construction |
|---|---|
| No construction necessary; plain and ordinary meaning | Indefinite |

Like the other terms that Apple has challenged, this one carries its plain and ordinary meaning. There is nothing indefinite about this limitation, which uses common words reasonably understood by skilled artisans and laypersons alike, such as "using," "latest," and "determine." A skilled artisan would have readily understood from the clear language of the claim alone that to "us[e] the *latest* security key" means to use the security key most recent in time to determine contents of a message received from the home PLMN. *See* Ex. C (Haas Decl.) at ¶57. The specification further supports this understanding. For example, the specification explicitly defines the term "latest" when it states that "[i]n one of the embodiments, the AUSF 600 and the electronic device 400 may only use the latest $K_{AUSF}$ resulting from the latest (e.g., most recent) successful Primary Authentication run." Ex. F ('312 Patent) at 7:11-15. The specification provides further guidance in explaining that a time stamp associated with a security key is one exemplary method of determining which of the two security keys in the latest:

> In operation 904, the processing circuitry 603 may make a determination to determine whether the time of the first time stamp is later than the time of the second time stamp. Responsive to the time of the first time stamp being *later than the time* of the second time stamp being determined in operation 904, the processing circuitry 603 may determine in operation 906 that the first security key is the latest security key. Responsive to the time of the second time stamp being *later than the time* of the first time stamp being determined in operation 904, the processing circuitry 603 may determine in operation 908 that the second security key is the latest security key.

Ex. F ('312 Patent) at 8:55-63 (emphasis added).

Thus, a skilled artisan would have understood that the claim means what it says; the security key most recent in time is used to determine contents of a message received from the home PLMN.

## V. CONCLUSION

For all the above reasons, Ericsson respectfully requests that the Court adopt the plain and ordinary meaning of each disputed term and reject Apple's indefiniteness arguments.

Dated: December 7, 2022

Theodore Stevenson, III (Lead Attorney)
Texas State Bar No. 19196650
ted.stevenson@alston.com
**ALSTON & BIRD**
2200 Ross Avenue, Suite 2300
Dallas, TX 75201
Telephone: (214) 922-3507
Facsimile: (214) 922-3899

Ross R. Barton
North Carolina State Bar No. 37179
ross.barton@alston.com
**ALSTON & BIRD**
101 S. Tryon St., Suite 4000
Charlotte, NC 28280
Telephone: (704) 444-1000
Facsimile: (704) 444-1111

Bryan Lutz (*pro hac vice*)
Georgia Bar No. 915395
bryan.lutz@alston.com
**ALSTON & BIRD**
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone: 404-881-7000
Facsimile: 404-881-7777

Christine Woodin
Texas State Bar 24199951
cwoodin@hueston.com
**HUESTON HENNIGAN LLP**
523 West 6th St., Suite 400
Los Angeles, CA 90014
Telephone:(213) 788-4099
Facsimile: (888) 775-0898

Respectfully Submitted,

  */s/ Ross R. Barton*
Nicholas Mathews
Texas State Bar No. 24085457
nmathews@McKoolSmith.com
Alexander Chern
Texas State Bar No. 24109718
achern@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Blake Bailey
Texas State Bar No. 24069329
bbailey@mckoolsmith.com
**MCKOOL SMITH, P.C.**
600 Travis Street, Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Telecopier: (713) 485-7344

John Holley
Texas State Bar No. 24078678
jholley@McKoolSmith.com
**MCKOOL SMITH, P.C.**
1999 K Street, NW Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Telecopier: (202) 370-8344

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 E. Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

**ATTORNEYS FOR DEFENDANTS
TELEFONAKTIEBOLAGET LM
ERICSSON AND ERICSSON INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via electronic mail on December 7, 2022.

*/s/ Ross R. Barton*
Ross R. Barton